**VINCO CORPORATION and Joseph J. Osplack, Plaintiffs,**

v.

**Axel C. WICKMAN and Wickman, Ltd., Defendants.**

**No. 11049.**

United States District Court
E. D. Michigan, S. D.

Nov. 4, 1959.

Miller, Canfield, Paddock & Stone, Detroit, Mich., Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for plaintiffs.

Maurice Robbins, Detroit, Mich., Melville E. Jones, Washington, D. C., for defendants.

KENT, District Judge.

This is an action to determine the priority of invention between the parties hereto under the provisions of Title 35, U.S.C.A. § 146.[1] The matter was previ-

---

1. "Any party to an interference dissatisfied with the decision of the board of patent interferences on the question of priority, may have remedy by civil action, if commenced within such time after such decision, not less than sixty days, as the Commissioner appoints or as provided in section 141 of this title, unless he has appealed to the United States Court of Customs and Patent Appeals, and such appeal is pending or has been decided. In such suits the record in the Patent Office shall be admitted on motion of either party upon the terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right of the parties to take further testimony. The testimony and exhibits of the record in the Patent Office when admitted shall have the same effect as if originally taken and produced in the suit.

"Such suit may be instituted against the party in interest as shown by the records of the Patent Office at the time of the decision complained of, but any party in interest may become a party to the action. If there be adverse parties residing in a plurality of districts not embraced within the same state, or an adverse party residing in a foreign country, the United States District Court for the District of Columbia shall have jurisdiction and may issue summons against the adverse parties directed to the marshal of any district in which any adverse party resides. Summons against adverse parties residing in foreign countries may be served by publication or otherwise as the court directs. The Commissioner shall not be a necessary party but he shall be notified of the filing of the suit by the clerk of the court in which it is filed and shall have the right to intervene. Judgment of the court in favor of the right of an applicant to a patent shall authorize the Commissioner to issue such patent on the filing in the Patent Office of a certified copy of the judgment and on compliance with the requirements of law."

ously heard by the Board of Interference Examiners of the United States Patent Office, who determined the interference in favor of the defendant Wickman. Since the hearing before the Board of Interference Examiners new evidence has been obtained and was presented to this Court. The following chronological facts are pertinent:

On October 20, 1938, defendant Wickman filed Provisional British Specification No. 30,323, in the British Patent Office.

On October 9, 1939, Wickman filed a complete British specification as a part of Application No. 30,323/38. The defendant claims that British Application No. 30,323 is not for the same invention as that covered by the claim of the patent in suit. The plaintiff contends that the British application is for the same invention as the claim of the patent in suit.

On October 31, 1939, Wickman filed United States Patent Application, Serial No. 302,251, based upon British Application No. 30,323.

On January 10, 1940, Wickman abandoned British Application No. 30,323.

On July 10, 1940, Wickman abandoned United States Application No. 302,251.

It was stipulated by counsel that between 1938, and August, 1943, Wickman completed a design which embodied the invention in suit, that in connection therewith he prepared over a thousand separate detail and assembly drawings between 1941 and October, 1942. These drawings together with photographic films were forwarded to persons in Cleveland, Ohio, including representatives of the Motor Tool Manufacturing Company of Detroit, Michigan.

In October, 1942, Wickman, and Motor Tool Manufacturing Company entered into an agreement for the exchange of ideas.

It was stipulated by counsel that between November 17, 1944, and January 11, 1945, the plaintiff Osplack conceived the invention in suit, in the United States.

By January 11, 1945, Osplack had reduced the invention to a pencil layout of the complete machine embodying the invention in suit.

On March 30, 1945, Wickman filed Provisional British Application No. 8,116, which disclosed and claimed the invention in suit and which matured into British Patent No. 591,916, which was published on October 27, 1947.

On March 5, 1946, Wickman filed his complete specifications for British Application No. 8,116, and on March 11, 1946, Wickman filed American Application No. 654,259, based upon British Application No. 8,116, and which disclosed and claimed the invention in suit, which American Application matured into Patent No. 2,449,354, and is the patent in suit.

On July 17, 1946, Wickman's American Application No. 654,259, was disclosed to the plaintiff Osplack by Motor Tool Manufacturing Company.

On August 15, 1946, Osplack and Vinco Corporation rejected Motor Tool Manufacturing Company's offer to sell rights based upon Wickman's American Application No. 654,259, and disclaimed any interest in the invention in suit without revealing to Motor Tool Manufacturing Company or to Wickman that Osplack had conceived the same invention on or about January 11, 1945, and that he intended to claim that he had reduced the invention to practice before July 17, 1946.

On March 5, 1947, Osplack filed American Application No. 732,521 which it is stipulated discloses the invention in suit but which defendant denies claimed the invention in suit.

On October 27, 1947, British Patent No. 591,916, based upon Wickman's British Application No. 8,116/45, was published.

On September 14, 1948, American Patent No. 2,449,354, the patent in suit, was issued to Wickman based upon Application No. 654,259.

On November 9, 1948, Osplack filed United States Application No. 59,166, which it is agreed disclosed the invention

in suit and about which there is a sharp conflict between the parties as to whether it claimed the invention in suit and should have created an interference.

On November 28, 1949, Patent Application No. 59,166, was amended by Osplack to copy the claim of Wickman's American Patent No. 2,449,354, to create an interference.

On January 26, 1950, an interference was declared.

On February 26, 1952, American Patent No. 2,587,202, based upon Application No. 732,521, was issued to Osplack covering a wheel dressing mechanism.

In May, 1951, the Board of Interference Examiners of the United States Patent Office decided the interference in favor of Wickman and on reconsideration, requested by Osplack, affirmed its previous decision in August, 1951.

The information relative to the 1938, 1939, and 1940, British and American applications by Wickman was not before the Board of Interference Examiners. Plaintiff claims that Wickman's 1938 British Application No. 30,323, as supplemented by the complete specification of 1939, upon which American Application No. 302,251 was based, disclosed and claimed the invention in suit in such a manner that the invention in suit would have been obvious to a person skilled in the art.

The claim of the complete specification is as follows:

"No. 30323.
"Date. 20. 10. 38
"Complete Specification.

"Improvements Relating to the Grinding of Toothed Gear Wheels, Splined Shafts, and Other Like Bodies".

"I, Axel Charles Wickman, a British Subject, of Queen Victoria Road, Coventry, in the County of Warwick, do hereby declare the nature of this invention and in what manner the same is to be performed, to be particularly described and ascertained in and by the following statement:—

"This invention has for its object to provide an improved process and means for grinding to the required form and size the faces of toothed gear wheels (including worms), splined shafts and other like bodies.

"The invention comprises a process in which a rotary grinding wheel having its working surface disposed in a helical form is caused to operate on the faces of the work piece to be ground, the work piece having imparted to it a unidirectional rotation at an appropriate rate while under the action of the grinding wheel.

"The invention also comprises a process as aforesaid in which the grinding wheel and work piece are also given further relative movement in a direction parallel with the work-piece surfaces to be ground, to enable the whole of the work piece faces to be ground to be brought under the action of the grinding wheel.

"Further the invention comprises the combination of a grinding wheel having its working surface disposed in a helical form, means for rotatably carrying the work piece, the said means being adjustable so as to enable the faces to be ground to be brought into appropriate relationship with the helical surfaces of the grinding wheel, means for effecting relative sliding movements between the work piece and grinding wheel, and means for effecting rotation of the grinding wheel and work piece at appropriate relative rates.

"In the accompanying sheets of explanatory drawings:—

"Figures 1 and 2 are views at right angles to each other of a grinding wheel acting in accordance with the invention on the working faces of a toothed gear wheel.

"Figures 3 and 4 are respectively a side elevation and a plan of a machine constructed in accordance with

the invention for grinding the working faces of toothed gear wheels.

"In carrying the invention into effect as shown, a grinding wheel $a$ of any convenient diameter has formed on its periphery a helix or work $b$ or a plurality of helices or worms. The cross section of the helix $b$, or each helix, is such that when the grinding wheel $a$ is rotated with the helix in engagement with the faces of the work-piece teeth to be ground, and the work-piece is rotated unidirectionally relatively to the grinding wheel at an appropriate rate, the faces and the thickness of the teeth can be brought to the desired form and size. For the grinding of the faces of involute teeth, the cross section of the helix of the grinding wheel would be similar to that of a slidable rack adapted to cooperate with the work-piece teeth. If desired the grinding wheel may also be suitably shaped to grind the tips and/or roots of the teeth and teeth spaces as well as the working faces.

"For effecting the grinding operation the grinding wheel $a$ and the work piece $c$ (which may be a single gear wheel or a pile of coaxially arranged gear wheels) are mounted in any suitable machine (with their axes in appropriate relationship) so that they can be rotated on their axes at appropriate relative rates, the faces of the helix $b$ on the grinding wheel being brought in contact with the faces of the teeth to be ground. The directions of rotation of the grinding wheel $a$ and work piece $c$ are indicated respectively by the arrows $x$, $y$ in Figures 1 and 2. The tooth faces of the work piece $c$ may be parallel with the axis of the work piece as shown in Figures 1 and 2, or they may be inclined to the axis of the work piece as in so-called helical gear wheels, but in either case the position of the work piece axis relatively to that of the grinding wheel $a$ is suitably inclined to enable the grinding wheel surface properly to engage the work piece. Also during the grinding operation, relative movement between the grinding wheel $a$ and the work piece $c$ is effected in a direction (indicated by the arrow $z$ in Figure 1) parallel with the tooth faces of the work piece, so that the whole length of each tooth face is brought under the action of the grinding wheel.

"An example of a machine for carrying the above described process into effect is shown in Figures 3 and 4. In this example the grinding wheel $a$ is rotatably mounted on a horizontally movable slide $e$. The rotation axis of the wheel is so disposed that the helical grinding surfaces presented to the work piece are vertical, that is to say the axis of the grinding wheel in the example illustrated is slightly inclined to the horizontal. The slide $e$ is movable by a hand wheel $f$ or other means along a support $g$ on the machine bed $h$ for moving the grinding wheel $a$ into or out of engagement with the work piece. The work piece is rotatably mounted between 'live' and 'dead' centres $i$, $j$ on a carrier $k$ which is angularly adjustable on a vertically movable supporting slide $m$ by a hand wheel $n$ or other means, the carrier $k$ being attached to the slide $m$ by bolts $o$ which pass through flanges or lugs $p$ on the carrier and engage an annular groove $r$ of T-shaped cross section in the slide. The latter is movable along a vertical guide $u$ on a support $v$ carried by the machine bed $h$.

"The machine above described can be used for dealing with work pieces having their tooth faces either parallel with or inclined to the axis of the work piece, the angular adjustability of the carrier $k$ enabling the teeth of either form of work piece to be brought into suitable relationship with the helical faces of the grinding wheel $a$.

"During the operation of the machine the work piece c is both rotated about its axis at any appropriate rate and is also moved vertically by the slide m so that the whole length of each tooth face on the work piece is brought under the action of the grinding wheel.

"If desired the two faces flanking each tooth space of the work piece c may be acted on simultaneously by the grinding wheel a, or alternatively such faces may be treated separately in successive operations.

"Hitherto the grinding of the faces of gear wheel teeth has been effected by one of two well known methods. In the one the rotary grinding wheel is shaped accurately to the required form of the teeth and is caused to traverse the tooth spaces of the work piece, the latter being rotated through an appropriate angular distance under the control of an indexing mechanism after each pair of adjacent tooth faces have been ground. In the other method, each tooth face in turn is caused to roll on a flat face of a rotary grinding wheel, the work piece being moved through an appropriate angular distance by an indexing mechanism after each grinding operation. In the method of my invention the work piece receives a continuous rotary unidirectional motion while under the action of the helix on the rotary grinding wheel. By this method the grinding operation can be effected with the required accuracy more rapidly than by either of the other two methods, and the machine required to carry out the grinding operation is simpler in that (for one reason) it requires no indexing mechanism.

"The application of the invention to the grinding of worms, splined shafts and other like bodies is essentially the same as that above described.

"Having now particularly described and ascertained the nature of my said invention and in what manner the same is to be performed, I declare that what I claim is:—

"1. A process for grinding the faces of toothed gear wheels (including worms), splined shafts and other like bodies, in which a rotary grinding wheel having its working surface disposed in a helical form is caused to operate on the faces of the work piece to be ground, the work piece having imparted to it a unidirectional rotation at an appropriate rate while under the action of the grinding wheel.

"2. A process as and for the purpose claimed in Claim 1 in which the grinding wheel and work piece are also given further relative movement in a direction parallel with the work-piece surfaces to be ground, to enable the whole of the work piece faces to be ground to be brought under the action of the grinding wheel.

"3. A machine for grinding the faces of toothed gear wheels (including worms), splined shafts and other like bodies, comprising the combination of a grinding wheel having its working surface disposed in a helical form, means for rotatably carrying the work piece, the said means being adjustable so as to enable the faces to be ground to be brought into appropriate relationship with the helical surface of the grinding wheel, means for effecting relative sliding movements between the work piece and grinding wheel, and means for effecting rotation of the grinding wheel and work piece at appropriate relative rates.

"4. A machine as and for the purpose claimed in Claim 3 and comprising the combination and arrangement of parts substantially as described and as illustrated in Figures 3 and 4 of the accompanying drawings. Dated this 9th day of October, 1939."

The claim of American Application No. 302,251, filed by Wickman in 1939, in effect duplicated the claim set forth above. It is the theory and claim of the plaintiff that the invention in suit would have been as obvious under the 1938 British Application and the 1939 American Application as it was under the claim of the patent in suit which is as follows:

"A machine for grinding the teeth of helically toothed gear wheels or other analogous work pieces by a grinding wheel having an operative peripheral surface of helical form, and comprising the combination of a grinding wheel spindle, a work spindle, an angularly adjustable support on which the work spindle is mounted and by which the work spindle can be set at such an angle in relation to the axis of the grinding wheel that the work piece surfaces to be ground are substantially in alinement with the operative surfaces of the grinding wheel helix, gearing for interconnecting the two spindles in constant speed relationship so that relative rotation thereof occurs at the rate which would result if the work piece derived its rotation from the grinding wheel, a slide carrying the angularly adjustable work spindle suport, and a fixed guide along which the slide is movable for effecting translational movements of the work spindle support relatively to the grinding wheel spindle in a direction parallel with the work piece surfaces to be ground."

It is admitted by the defendants that the 1938 application discloses the invention in suit although they deny that it claims the invention in suit.

Assuming that both applications were for the same invention, the legal issue is presented as follows:

Where the inventor has filed an application in England and abandons the same and it remains unpublished and later files another application in England, does his right of priority under the International Treaty, date from the abandoned application or the subsequent application filed in the foreign country?

The resolution of this legal issue is necessarily dependent upon interpretation of Article 4A(1 and 2), and 4C(1 and 2), of the International Convention for the Protection of Industrial Property signed in London, June 2, 1934, revising previous conventions.

This Treaty is implemented by § 119, Title 35 U.S.C.A.

"An application for patent for an invention filed in this country by any person who has, or whose legal representatives or assigns have, previously regularly filed an application for a patent for the same invention in a foreign country which affords similar privileges in the case of applications filed in the United States or to citizens of the United States, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within twelve months from the earliest date on which such foreign application was filed; but no patent shall be granted on any application for patent for an invention which had been patented or described in a printed publication in any country more than one year before the date of the actual filing of the application in this country, or which had been in public use or on sale in this country more than one year prior to such filing.

"No application for patent shall be entitled to this right of priority unless a claim therefor and a certified copy of the original foreign application, specification and drawings upon which it is based are filed in the Patent Office before the patent is granted, or at such time during the pendency of the application as required by the Commissioner not earlier than six months after the fil-

ing of the application in this country. Such certification shall be made by the patent office of the foreign country in which filed and show the date of the application and of the filing of the specification and other papers. The Commissioner may require a translation of the papers filed if not in the English language and such other information as he deems necessary."

It is defendants' contention that under the language of the Treaty and the law of England, the abandoned 1938 Application was a complete and absolute nullity and therefore could have no effect upon Wickman's right to priority.

It is the theory of the plaintiffs that Article 4C(2) of the International Treaty, "these periods shall start from the date of filing of the first application", means exactly what it says and that Wickman's first application which disclosed and claimed the invention in suit was in 1939 when the complete specifications were filed, that when he failed to pursue to maturity an application for an American Patent within 12 months thereafter he lost all right to priority in this country.

The Court has been cited to the case of Ex Parte Lehmann which has been read with interest, and which the Court considers completely lacking in authority for the determination of the present controversy.

Two decisions were offered in evidence from the British Patent Office, "Matter of VandePool's Patent" before the Attorney General, 1889, and the matter of the application of "Whittin Machine Works", both found in Reports of Patent Design and Trademarks cases, Vol. LIV, page 273, which the Court does not consider controlling, it being the firm conviction of this Court that the rights of the parties in this case are dependent upon the provisions of the International Treaty as implemented by the Laws of the United States.

If we assume that the filing by Wickman in 1938/1939, had within the meaning of Article 4A(2), "the value of a formal internal filing by virtue of the internal law" of Great Britain, then we have not been cited any cases and no evidence has been offered which satisfactorily discloses that Wickman's initial application became an absolute nullity upon abandonment.

We are satisfied that the plaintiffs' position is well taken in this regard and that "first application" means exactly what it says when used in the 1934 Treaty and when used in the Statute of the United States. The only question under this issue, therefore, is whether the "first application" by Wickman disclosed and claimed the invention in suit. From the testimony of the witness, Leonard J. Smith, it appeared very clearly to this Court, at the time of the hearing of this case, that to one skilled in the art, Wickman's "first application" disclosed and claimed the invention in suit and the Court so holds.

Another issue before the Court is, and we adopt the defendants' language:

"Where the plaintiffs received a copy and complete knowledge of defendants' United States Application on July 17, 1946, and failed to file a claim on the invention disclosed until November 9, 1948, or November 28, 1949, or even to inform defendants that they already considered themselves to be the inventors, were they guilty as a matter of law of laches, and are they thereby estopped from claiming the invention after that lapse of time."

It appears from a stipulation of facts that Osplack, without the aid of any information from Wickman, conceived the invention in suit between November, 1944, and January, 1945. There is some question in the Court's mind as to whether he realized the importance or value of the invention in suit since he used the ideas conceived as a basis for application No. 732,521, for a wheel dressing mechanism which resulted in Patent No. 2,587,202.

It would appear from all of the evidence that even upon disclosure of Wickman's American Application in 1946, plaintiffs did not realize the value of the invention in suit. Certainly he took no steps to inform the defendants or the Patent Office of any claimed priority. He quite obviously rested on his laurels until his application No. 59,166, November 9, 1948, as amended November 20, 1949, some two years after the defendant had made an effort to make provision for an American market through the plaintiff company.

■ Having in mind these facts and the fact that British Patent No. 591,196, the duplicate of the patent in suit, was published in October, 1947, it is the Court's firm conviction that the plaintiff is not and should not be entitled to any patent because of his concealment and delay. In re Allsop et al., 58 App.D.C. 187, 26 F.2d 559, 560:

"Section 4904, R.S. (35 USCA § 52, Comp.St. § 9449), authorizes the Commissioner of Patents, upon the filing of an application which in his opinion 'would interfere with any pending application, or with any unexpired patent,' to declare an interference 'to determine the question of priority of invention'; but there were no claims in appellants' application that conflicted with the claims of the Buckley application, and evidently 'in the opinion of the Commissioner' the applications did not conflict. That the then view of the Commissioner was not unreasonable is made to appear, not only from the fact that appellants' application contained no conflicting claims, but from the further fact that appellants finally canceled all the claims in their application and amended their specification. In other words, for about four years, during the pendency of the Buckley application, appellants, with full knowledge of it, failed to make any claims conflicting therewith, and because of such failure the Buckley patent was issued without the declaration of an interference.

"Since it required more than four years for appellants to discover interfering subject-matter in the two applications, it is not strange that the Commissioner did not of his own motion declare an interference. In the circumstances, he was quite justified, when he issued the Buckley patent, in assuming appellants would make no claim to the invention therein disclosed. Buckley was without fault, because he was without knowledge of appellants' application.

"Should an interference now be declared, and priority awarded appellants, the public would be prejudiced. The Buckley patent is dated July 8, 1924, and since that time the public, of course, has been excluded from the practice of the invention. Should a patent be issued to appellants, it is apparent that the public would be excluded from practicing the invention for a further period of 17 years from its date. This result is directly attributable to the deliberate failure of appellants to act when they should have acted. The object of the patent laws is the stimulation of invention for the benefit of the public, and where, as here, the Commissioner of Patent acts in the interests of the public, and without prejudice to the real rights of applicants, he should be upheld."'

In view of the matters set forth above it is perhaps unnecessary for the Court to determine the other point raised by the defendants, "Where the plaintiffs failed to make the claim of the count in suit within one year from the date that defendants' United States Patent was granted, are the plaintiffs barred from asserting such claim in an interference proceeding as required by Title 35, U.S.C. § 135."

"Whenever an application is made for a patent which, in the opinion of the Commissioner, would interfere

with any pending application, or with any unexpired patent, he shall give notice thereof to the applicants, or applicant and patentee, as the case may be. The question of priority of invention shall be determined by a board of patent interferences (consisting of three examiners of interferences) whose decision, if adverse to the claim of an applicant, shall constitute the final refusal by the Patent Office of the claims involved, and the Commissioner may issue a patent to the applicant who is adjudged the prior inventor. A final judgment adverse to a patentee from which no appeal or other review has been or can be taken or had shall constitute cancellation of the claims involved from the patent, and notice thereof shall be endorsed on copies of the patent thereafter distributed by the Patent Office.

"A claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent may not be made in any application unless such a claim is made prior to one year from the date on which the patent was granted."

■ It is the opinion of this Court that *Section 135*, like the statute implementing the International Treaty, means exactly what it says. That is, the interference must be created within one year from the time the patent interfered with is issued. We are satisfied.that plaintiffs' application No. 59,166, filed on November 9, 1948, disclosed but did not claim the invention in suit and that the amendment on November 28, 1949, to create the interference between plaintiffs' application No. 59,166, and defendants' Patent No. 2,449,354, is outside the purview of the statute and does not create such interference. In all other respects the Court is in accord with the views expressed by the Board of Interference Examiners based upon the information which was before such Board of Examiners.

Plaintiffs' counsel will prepare the necessary orders voiding the defendants' Patent No. 2,449,354, for lack of priority, and denying to plaintiffs the right to a patent under Application No. 59,166 because of laches.